UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Darran Farmer,                                      Case No. 22-cv-2974 (KMM/DLM)

          Plaintiff,

                                **ORDER**

v.

FilmTec Corporation, and DuPont
De Nemours, Inc.,

          Defendants.

---

Plaintiff Darran Farmer brought this action against his former employer, Defendant FilmTec Corporation, a wholly owned subsidiary of DuPont De Nemours, Inc. (collectively, "FilmTec") alleging discrimination, interference and retaliation, failure to accommodate, hostile workplace environment, and wrongful discharge under numerous federal and state laws. Compl., ECF No. 1.

In Counts One and Two of Mr. Farmer's complaint, he alleges discrimination on the basis of disability by FilmTec in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Minnesota Human Rights Act, Minn. Stat. 363A.01, *et seq.* ("MHRA"), respectively. In Counts Three, Four, and Five, he alleges interference and retaliation in violation of the ADA, MHRA, and the Family Medical Leave Act ("FMLA"). Mr. Farmer also claims that FilmTec subjected him to a hostile workplace environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the MHRA in Counts Eight and Nine, respectively. And lastly, in Counts Ten and Eleven,

Mr. Farmer alleges retaliation in violation of Title VII and the MHRA.[1]

FilmTec seeks summary judgment on Mr. Farmer's claims. ECF No. 32. FilmTec argues that (1) Mr. Farmer's claims based on his termination of employment under the ADA and Title VII (Counts I, III, VIII, and X), must be dismissed because he failed to exhaust his administrative remedies; (2) Mr. Farmer's MHRA claims (Counts II, IV, VII, and IX) are untimely; (3) Mr. Farmer's disability discrimination claims (Counts I and II) fail as a matter of law; (4) Mr. Farmer's ADA and MHRA interference and retaliation claims (Counts III and IV) fail as a matter of law; (5) Mr. Farmer's FMLA interference and retaliation claims (Count V) fail as a matter of law; (7) Mr. Farmer's Title VII and MHRA hostile work environment claims (Counts VIII and IX) fail as a matter of law; and (8) Mr. Farmer's Title VII and MHRA retaliation claims (Counts X and XI) fail as a matter of law.

For the reasons discussed below, the Court **GRANTS** FilmTec's motion for summary judgment.

## BACKGROUND

Mr. Farmer, an African-American male, worked as a Senior Manufacturing Operator in the Aqua40 Department for FilmTec, a company that specializes in water separation and purification solutions, in its Water and Process Solutions division located in Edina, Minnesota. Compl. ¶¶ 8–9, 11, ECF No. 1. Mr. Farmer is a Type 1 diabetic, and his diabetes required him

---

[1] In response to FilmTec's motion for summary judgment, Mr. Farmer has agreed to dismiss the following claims: failure to accommodate under the ADA (Count 6); failure to accommodate under the MHRA (Count 7); and wrongful discharge in violation of Minnesota public policy (Count 12). As such, the Court need not address these claims further. Farmer's failure to accommodate and Minnesota public policy claims are, therefore, dismissed as moot.

to take occasional breaks from his employment duties, take more frequent bathroom breaks and maintain a more disciplined diet, and it also causes vision issues. ECF No. 47, Ex. 23, Farmer Dep. 65.

Mr. Farmer began working for FilmTec in 2009 through Kelly Temporary Services, Farmer Dep. 63, and on March 28, 2010, FilmTec hired him directly, ECF No. 38-6, Rita Kaluza Decl., Ex. 8, Minn. Employee Wage Notice. Farmer worked for FilmTec for nearly 10 years until his termination. Compl. ¶¶ 8, 10. As essential functions of his position, Farmer occasionally lifted over 50 pounds, lifted and hauled up to 45 pounds, pulled up to 82 pounds, and pushed up to 50 pounds. Kaluza Decl., Manufacturing Operator Job Description, Ex. 7, ECF No. 35-1. At all relevant times, Mr. Farmer reported to his direct supervisor, Maurice Roberts. Farmer Dep. 66.

### *Farmer's Attempts at a Promotion*[2]

During his employment, Mr. Farmer applied for a position that was posted internally by FilmTec within FilmTec's Membrane Department. Farmer Dep. 69. He did not get the position. *Id.* Farmer's supervisor, Roberts, indicated that:

> [Farmer] actually knew pretty much all of the facets of the job, and from time to time . . . when we needed someone to actually fill . . . those spots . . . [Farmer] was picked . . . to do material handling.

ECF No. 47, Ex. 26, Roberts Dep. 273. Farmer was told by Debra Robertson ("Robertson"), the Unit Manager for Fabrication, that he was denied the promotion because his only

---

[2] Mr. Farmer did not directly raise a failure to promote claim in his complaint. However, he describes the promotions he sought and did not receive as part of his overall experience at FilmTec, and he points to them in briefing as to several of his claims.

motivation for wanting to go to the department was for more money, as opposed to wanting to be an integral part of the membrane team. Farmer Dep. 69. Farmer was also informed by Ms. Robertson that she wanted to keep as many senior operators in her department as possible, since she was new in her role as Operations Leader at the time. *Id.*

Mr. Farmer also applied to be a Back-Up Lead Technician, a position that was posted internally by FilmTec as well. *Id.* He did not get the position either. *Id.* Robertson canceled Mr. Farmer's interview and hired an employee that had left FilmTec four years prior to Robertson's tenure. *Id.* Clever Barbosa ("Barbosa"), an individual with FilmTec who trained Robertson, informed Mr. Farmer that he would speak with Robertson and told Mr. Farmer that he should have received an interview for the position. *Id.* After Mr. Farmer's conversation with Barbosa, Robertson called Mr. Farmer to her office and scolded him. Robertson informed Mr. Farmer that she was doing the best she could for the department and that he did not understand the business side of what she was doing. *Id.* at 70.

### *April 2020 Ethics Hotline Complaint*

According to FilmTec's policies, it investigates reports of suspected violations of law or policy and takes necessary corrective action, and it prohibits retaliation against employees who, in good faith, report suspected misconduct or participate in investigations into suspected misconduct. ECF No. 47, Ex. 1, DuPont Code of Conduct at 6. FilmTec also maintained a policy prohibiting harassment and violence in the workplace. ECF No. 39, Ex. 2, FilmTec Handbook & Policies at 2.

On April 14, 2020, Roberts issued Mr. Farmer a "documented coaching" for leaving his workstation without advising Roberts or a Lead Technician prior to doing so. ECF No. 47,

Luthens Decl., Ex. 4, Documented Coaching. Shortly thereafter, on April 16, 2020, Mr. Farmer filed an anonymous complaint through DuPont's Ethics and Compliance Hotline (the "Ethics Hotline"). Compl. ¶ 13; DuPont Code of Conduct at 6. Any call made by employees to the Ethics Hotline is subsequently transcribed and submitted as a complaint for further action. Farmer Dep. 69. In Mr. Farmer's complaint to the Ethics Hotline, he claimed that he was written up for failing to advise his supervisor that he was leaving work due to illness from diabetes, was passed over for promotions, was treated differently by supervisors for going to the medical department, and was ignored by management. Compl. ¶ 13; April Complaint, Luthens Decl., Ex. 5; Farmer Dep. 69.

### Kaluza's Post-April 2020 Hotline Complaint Investigation

On May 8, 2020, Rita Kaluza ("Kaluza"), FilmTec's human resources manager, began investigating the complaint by interviewing second shift leaders. Kaluza Decl., Ex. 10, Investigative Notes. Kaluza conceded that there was a "lack of leadership" on the fourth shift and as a result, a supervisor moved full-time to the shift, but she could not substantiate the other claims. *Id.*; Compl. ¶¶ 14–15.

### May 2020 Ethics Hotline Complaint

On May 18, 2020, Mr. Farmer anonymously contacted the Ethics Hotline again, and this time, Farmer raised additional allegations stating that "1) racist things were posted on the information board; 2) supervisors say the 'n' word, comment that 'those people are lazy,' and make 'chicken and watermelon jokes;' and 3) supervisors make comments about Ramadan and make it difficult for employees to leave their workstations to pray." Compl. ¶ 16; Luthens Decl., Ex. 5.

### Kaluza's Post-May 2020 Hotline Complaint Investigation

On May 20, 2020, Ms. Kaluza began investigating by interviewing twelve FilmTec employees and leaders in the Aqua40 Department. Kaluza Decl., Ex. 10. Kaluza was only able to substantiate the allegation that FilmTec employees posted racist things on the information board as her investigation revealed that a racially insensitive sign where the words "Chinese Origin Virus Infectious Disease" had been handwritten under "COVID" on a notice that had been posted on the manufacturing floor. Compl. ¶¶ 17–18; Kaluza Decl., Ex. 10.

### June 2020 Ethics Hotline Complaint

On June 11, 2020, Mr. Farmer contacted the Ethics Hotline anonymously again. Luthens Decl., Ex. 5. He reported that nothing was being done about his previous complaints and that employees involved in the investigation had attempted to ascertain the complainant's identity. *Id.* He specifically reported two employees, Jeffrey Herr ("Herr") and William Pace ("Pace"), for using racist language when speaking about supervisor Roberts, who is African American. Farmer Dep. 77. Herr was the only person Mr. Farmer personally heard use racist language in the workplace. *Id.*

### Kaluza's Post-June 2020 Hotline Complaint Investigation

Ms. Kaluza interviewed Mr. Farmer and other staff members as part of her investigation into the complaint that same day. Kaluza Decl., Ex. 10. Farmer reported to Kaluza that while he had not heard any supervisor use racial slurs, he had heard his coworkers use derogatory language, though not directed at him. *Id.* At least two workers said they overheard Herr or Pace using racially offensive words at work, especially when referring to Roberts. *Id.* Apart from that, workers had general misconduct complaints regarding Herr and Pace that were unrelated

6

to allegations that they behaved in a racist manner. *Id.* In response to their violations of the Code of Conduct's Respect for People guidelines, FilmTec placed Herr and Pace on administrative leave on June 15, 2020, and on June 25, 2020, FilmTec terminated their employment and closed the investigation. *Id.*

### *Farmer Speaks with Kaluza*

On July 2, 2020, Mr. Farmer requested to speak with Kaluza. Kaluza Decl. Ex. 10. In the meeting, Farmer voiced his displeasure to Kaluza about the documented coaching he had received in April and expressed his belief that Ms. Robertson ought to bear responsibility for the actions of Herr and Pace. *Id.* Farmer also took issue with Ms. Robertson's handling of his two applications for promotion. *Id.*

### *Kaluza Meets with Robertson Post-July 2 Meeting*

On July 16, 2020, Kaluza met with Robertson and shared Farmer's concerns. *Id.* Ms. Robertson explained that the selection team for the promotions felt Mr. Farmer was only interested in making more money and that he would not be an integral member of the new team. *Id.* Regarding the Back-Up LT position, Robertson explained that she had canceled all interviews after making an offer to an external candidate. *Id.* Kaluza counseled Robertson about proper practices during the recruitment and selection process. *Id.* And on July 28, 2020, Ms. Kaluza held a meeting with Mr. Farmer and Ms. Robertson, and Ms. Kaluza described the discussion as ending on a positive note. *Id.*

### *Farmer Files a Charge*

On August 18, 2020, Mr. Farmer filed his first discrimination charge with the Equal Employment Opportunity Commission ("EEOC") which was cross-filed with the Minnesota

Department of Human Rights ("MDHR"). Compl. ¶ 23; Luthens Decl., Ex. 6, Aug. 18 Charge.

On the charge, Mr. Farmer checked boxes for discrimination based on race, retaliation, and

disability. Aug. 18 Charge. As to the particulars of the charge, Mr. Farmer alleged he was

denied opportunities for advancement and experienced racial harassment and retaliation. *Id.*

He also alleged discrimination and retaliation in violation of Title VII and Title I and V of the

ADA:

> I. I was hired by the above named Respondent in October 2011. During my
> employment I have been denied opportunities for advancement and am being
> harassed because of my race. I complained of discrimination have been retaliated
> against based on my race and disability.
>
> II. I believe that I am being discriminated and retaliated against because of my
> race, Black, and my disability, in violation of Title VII of the Civil Rights Act
> of 1964, as amended and of Titles I and V of the Americans with Disabilities Act
> of 1990, as amended.

*Id.* Mr. Farmer alleged that the discrimination began at the earliest on August 1, 2019 through

August 14, 2020, and checked a box indicating that the action was continuing. *Id.* Farmer

initiated the EEOC Charge process at the same time he first called the Ethics Hotline in 2020,

however the Charge was not filed until August 2020 due to the pandemic. Farmer Dep. 78.

### *Kaluza Resolves July 2020 Concerns*

On September 5, 2020, Farmer emailed Kaluza about the status of the complaints he

had raised during their conversation in July. Luthens Decl., Ex. 7. Ms. Kaluza confirmed that

Mr. Farmer had been wrongfully reprimanded for leaving the workplace floor. Compl. ¶ 20.

An investigation showed Mr. Farmer had given notice, and on September 11, 2020, Kaluza

informed Mr. Farmer that the discipline was lifted and she had removed the documented

coaching from April 2020 from his file. *Id.* She also informed Mr. Farmer that she was

implementing tools to assist leaders with hiring. *Id.* He was satisfied with this result. Farmer Dep. 83. Mr. Farmer emailed Kaluza to thank her for all she had done for him and said he had been in a bad place emotionally and professionally. Luthens Decl., Ex. 8.

### *The Health Services Department and Farmer's Back Injury*

FilmTec maintained a Health Services Department ("Health Services") that coordinated employees' return to work following illness or injury, assisted employees who sustained work-related injuries, and ensured employees received proper workplace restrictions or accommodations when necessary. ECF No. 37, Beth Ringquist Decl. ¶ 3. During the relevant timeframe, nurses Beth Ringquist ("Ringquist") and Mary Ellen Perry ("Perry") worked in FilmTec's Health Services Department. Ringquist Decl. ¶ 4. FilmTec also partnered with a third-party administrator, Sedgwick, to manage and administer its leave of absence and short-term disability benefits programs, which includes leave protected by the FMLA. Kaluza Decl., Exs. 2, 3.

On August 20, 2020, Mr. Farmer injured his back while pouring concrete at home and was unable to work. Farmer Dep. 80; Ringquist Decl., Ex. 1. Nurse Perry advised Farmer to see his doctor and get a doctor's note. Ringquist Decl. ¶ 4; Ringquist Decl., Ex. 1.

### *Farmer Returns to Work, But His Performance Suffers*

On September 11, 2020, Mr. Farmer returned to work. Farmer Dep. 82. But on September 15 and 16, Mr. Farmer called out of work due to back pain and reported to Health Services that he may need additional time off. Kaluza Decl., Ex. 12; Ringquist Decl., Ex. 1. Sometime in September, he returned to work again.

Throughout the week of October 5, 2020, FilmTec noted a decline in Mr. Farmer's work performance. Once again, Mr. Farmer missed work without calling in. Kaluza Decl., Ex. 13. Because Mr. Farmer was falling behind in his required training courses, known as "iLearning," Roberts scheduled his removal from the manufacturing floor on October 6th so that Mr. Farmer could complete his courses. *Id.*; Luthens Decl. Ex. 9. There were three courses left for Mr. Farmer to finish by the end of the day that would take an estimated three hours to complete. Kaluza Decl., Ex. 13. By the next day, Mr. Farmer had not finished any of the three courses. *Id.* Mr. Roberts claimed that Mr. Farmer grew combative when he questioned Mr. Farmer about why he had not finished the classes. *Id.*

On October 8, 2020, Roberts noticed that Mr. Farmer was away from his workstation on multiple occasions and stated that Mr. Farmer again became argumentative when Mr. Roberts directed him to stay at his workstation while not on break. *Id.* Mr. Roberts prepared a draft of a written warning about Mr. Farmer's misconduct and emailed it to Ms. Kaluza on October 11th. He also informed Mr. Farmer that he would be dealing with HR the following Monday. *Id.*, Ex. 14.

On October 9, 2020, Mr. Farmer lodged a lengthy complaint regarding Mr. Roberts with the Ethics Hotline. Luthens Decl., Ex. 10; Farmer Dep. 84–85. He described Mr. Roberts telling him to remain at his desk and said, among other things, that Mr. Roberts behaved disrespectfully. Luthens Decl., Ex. 10. Ms. Kaluza investigated the complaint, and at Mr. Farmer's suggestion, spoke to two of Mr. Farmer's colleagues. Kaluza Decl., Investigation Summary Report I, Ex. 15. Both of Mr. Farmer's colleagues claimed they had never seen Mr. Roberts treat Mr. Farmer disrespectfully and that Mr. Farmer had complained about

Roberts advising him to keep on task when he was supposed to be at his station on specific machines. *Id.* Kaluza determined that the investigation did not support a judgment that Roberts harassed Mr. Farmer, and that Mr. Farmer had been off task and had probably submitted a complaint in anticipation of facing disciplinary action. *Id.*

### *Farmer Takes Time Off for Back Pain Again*

After Mr. Farmer reported having back pain at work on October 13, 2020, he was sent home for the day. Ringquist Decl., Ex. 1. This time he was away from work for an extended period. Although Mr. Farmer informed Health Services he would follow up after a medical appointment on October 21, 2020, he failed to do so and did not show up for work the next day. *Id.* On October 23, 2020, Mr. Farmer informed Nurse Ringquist from Health Services that he had scheduled his first session for physical therapy on October 26, 2020, as recommended by his doctor. *Id.* Mr. Farmer was reminded to produce a doctor's letter to substantiate the need for leave to Health Services. *Id.*

Nurse Perry met with Mr. Farmer on November 2, 2020, and once more asked for a doctor's note. *Id.* Mr. Farmer indicated he was unsure about how long he would be on leave from work. *Id.* On November 3, 2020, Health Services received a message from Mr. Farmer's physician indicating he could return to work on November 6, 2020, but required a 25-pound lifting restriction. *Id.*; Ex. 2. A completed "Statement of Incapacity" form from Mr. Farmer's doctor was submitted on November 4, 2020, but this document stated that he could resume work with a 20-pound lifting restriction. Luthens Decl., Ex. 11. Ringquist contacted Mr. Farmer on November 6, 2020, regarding scheduling a visit at Minnesota Occupational Health ("MOH") so that his return to work and any limitations or accommodations could be

determined. It was decided that Mr. Farmer could instead submit medical records from his physical therapist regarding his limitations when he resumed work on November 9, 2020. Ringquist Decl., Ex. 1.

For almost two months, FilmTec worked with Mr. Farmer to attempt to clear him to return to work. On November 9, 2020, Mr. Farmer informed Nurse Ringquist that he was unable to obtain a note from his physical therapist regarding his condition, and he agreed to visit the MOH instead. *Id.* Unfortunately, Mr. Farmer missed his first appointment at MOH. Health Services rescheduled another appointment for November 17, 2020, but Mr. Farmer left before the work simulation could be completed. *Id.* In order to finish its workability assessment, MOH agreed to obtain documents from Mr. Farmer's primary care physician in lieu of the simulation. Ringquist Decl., Ex. 3. Nurse Perry advised Mr. Farmer to stay at home from work until Health Services received MOH's completed report. *Id.*, Ex. 1. Health Services followed up with MOH and Mr. Farmer several times in the first few weeks of December to find out whether his primary care physician had forwarded the requested records to MOH. *Id.*, Ex. 4. On December 17, 2020, Ringquist arranged for Mr. Farmer to attend a second work simulation at MOH on December 21, 2020, as the agency had still not received the needed records after several weeks. *Id.*, Ex. 1. Mr. Farmer passed that simulation and was cleared to return to work. On December 22, 2020, Ringquist called Mr. Farmer twice to discuss his return to work, but Mr. Farmer did not respond. *Id.*

On December 23, 2020, Nurse Ringquist attempted to contact Mr. Farmer five times to discuss his return to work. *Id.* According to Nurse Rinquist, Mr. Farmer did not respond. *Id.* That same day, Ms. Kaluza emailed Mr. Farmer instructing him to contact Health Services by

3:30 pm that day. Luthens Decl., Ex. 12. She further stated,

> If you do not make an attempt to reach [Health Services] (either via phone or email) regarding your return to work before the end of business today 3:30pm (when the clinic closes) Leadership may review your employment status.

*Id.*

According to Osiris Renz ("Renz"), an Operator, it was uncommon in his experience for Kaluza to be involved with an employee's medical leave:

> **Sherouse**: Got you. Was HR normally involved in the approval of medical leave in your experience?
> **Renz**: No
> . . . .
> **Renz**: [I]t seemed kind of odd to me. I don't know.
> **Sherouse**: Why'd that seem odd to you?
> **Renz**: 'Cause I never had to work with HR with my medical leave at -- the medical leave I had. I don't remember working with -- with like the head of HR. I think there was a -- an HR system to help with some of the paperwork and the information. But the – then again, that was two years earlier.
> **Sherouse**: But at that time, you weren't aware if HR had to be involved?
> **Renz**: I didn't think they had to.
> **Sherouse**: Okay. Do you recall anyone telling you about a change in policy that would've required Rita to be involved?
> **Renz**: Not specifically, no.

ECF No. 50-2, Osiris Renz Dep. 19–21. Renz also stated that he believed Kaluza showed a similar uncharacteristic level of involvement with the leave of Emmanuel Lewis, another African-American employee. Renz Dep. 21.

On December 28, 2020, Mr. Farmer finally contacted FilmTec. Farmer Dep. 91. He informed FilmTec that he had a new phone, phone number, and email address. *Id.* at 91–92. On the same day, Kaluza sent Mr. Farmer an email stating that she understood he had lost his phone, but he had failed to inform anyone at FilmTec of his new contact information or respond to Health Services as instructed, so he would remain off work. Luthens Decl., Ex. 12.

### *Farmer's Return-to-Work Meeting*

Ms. Kaluza sent a message to Mr. Farmer on January 27, 2021 informing him that he would be permitted to work on February 1, 2021 once he had visited the nurse, attended a meeting with herself and Maurice Roberts, and reviewed documents. Luthens Decl., Ex. 14; Compl. ¶¶ 26–27. On February 1, 2021, Mr. Farmer reported for work. Farmer. Dep. 92–93. When Mr. Farmer arrived at FilmTec's location, he met with the nurse and then attended a meeting with Ms. Kaluza, and Mr. Roberts. *Id.* During the scheduled meeting, Kaluza and Roberts presented Mr. Farmer with a documented verbal warning and a written warning. *Id.*; Luthens Decl., Exs. 15, 16. The verbal warning was based on Mr. Farmer's no call/no show absence on October 5, 2020. Compl. ¶ 29; Luthens Decl., Ex. 15. And the written warning was based on his performance during the week of October 6, 2020. *Id.*, Ex. 16. Mr. Farmer alleges he asked for time to review and respond to the discipline, but he was advised that they would be placed in his employment file regardless of his response. Kaluza further advised that Mr. Farmer was on a "final warning," meaning any further infraction would result in his termination. Compl. ¶¶ 29–30. Mr. Farmer became very upset. Farmer Dep. 96; ECF No. 47, Ex. 24, Rita Kaluza Dep. 202.

There is a dispute about what was said next, and during his deposition, Mr. Farmer himself described what was said in a couple of different ways. But according to Mr. Farmer, he uttered at least the following remarks to Mr. Roberts:

> You're lying. I'm not threatening you. A threat would be something like, well, when I catch you outside I'm going to beat the shit out of you. That would be a threat. But, no, I'm not threatening you. I'm just letting you know that – she don't know, but you and I know what this was really about.

*Id.* at 96. Ms. Kaluza states that Mr. Farmer turned to Mr. Roberts and said, "[yo]u're a fucking liar, Maurice. You motherfucker. You'll see me again." Mr. Farmer then stood up and allegedly pointed his finger at Roberts. Kaluza Dep. 202. In any case, Kaluza then asked Mr. Farmer to return his badge, and Mr. Farmer left the facility. Compl. ¶¶ 31–32; Farmer Dep. 96; Kaluza Dep. 202.

Immediately after the meeting, Kaluza completed an investigation report summarizing the situation. Kaluza Decl., Ex. 16. Roberts gave a written statement that was included in the document. *Id.* Roberts indicated that he felt threatened by Mr. Farmer's actions, including calling him a liar, pointing a finger at him menacingly, cursing at him, and saying, "I will see you again." *Id.* On February 2, 2021, FilmTec officially fired Mr. Farmer after concluding that his behavior during the meeting had broken multiple policies, including the Respect for People guidelines. *Id.*; Luthens Decl., Ex. 17.

### *EEOC Dismisses Farmer's Charge; Farmer Brings Suit*

The EEOC sent FilmTec a Request for Information on January 28, 2022. Luthens Decl., Ex. 18. The EEOC did not ask for any information about any accommodation requests that Mr. Farmer had made. *Id.* On February 23, 2022, the EEOC contacted Mr. Farmer to inquire if he wanted to amend the Charge to include his discharge. *Id.*, Ex. 19. The Charge was never officially amended. *Id.* On August 30, 2022, the EEOC dismissed the Charge and sent Mr. Farmer a right to sue letter, dated August 30, 2022, which he received on or around September 10, 2022. Compl. ¶ 37; Luthens Decl., Ex. 20.

On November 28, 2022, Mr. Farmer filed this suit against FilmTec.

**DISCUSSION**

## I.      Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322–23. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *see also McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *see also Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021).

## II.      Exhaustion

Mr. Farmer raises several claims based at least in part on his termination from FilmTec. But FilmTec alleges that Mr. Farmer's August 18, 2020 Charge was filed before his termination in February of 2021, and was based on "discrete employment actions that occurred

16

prior to his termination." ECF No. 34, Def.'s Mem. 17. Furthermore, FilmTec states that because Mr. Farmer did not file a new charge or otherwise amend his August 18, 2020 Charge to assert that his termination was unlawful, Mr. Farmer did not properly exhaust his claims. Mr. Farmer counters that he completed the requirements to exhaust the administrative remedies available to him. Mr. Farmer further asserts that because he selected the boxes for "Race, Retaliation, and Disability," on his August 18, 2020 Charge, the primary claims brought, the conduct was continuous and that he was not required to "run" to the EEOC for each offense. Mr. Farmer also notes that the EEOC was aware of his termination during their investigation, which continued for more than a year after he was fired. Finally, Mr. Farmer alleges that the EEOC provided a Right to Sue letter on August 30, 2022, more than a year after Mr. Farmer's termination.

To bring a claim under the ADA, a plaintiff must first file a complaint with the EEOC. *Sellers v. Deere & Co.*, 791 F.3d 938, 943 (8th Cir. 2015). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice and must be individually addressed before the EEOC." *Id.* (internal quotation marks omitted); *Voss v. Housing Auth. of the City of Magnolia, Ark.*, 917 F.3d 618, 623 (8th Cir. 2019) (same). "To exhaust administrative remedies for an ADA claim, Mr. [Farmer] was required to timely file a charge of discrimination with the [EEOC] and receive a right-to-sue letter from the EEOC." *Cermak v. Host Int'l*, No. 18-cv-1267 (SRN/KMM), 2018 WL 7254600, at *2 (D. Minn. Nov. 27, 2018), *report and recommendation adopted,* 2019 WL 259653 (D. Minn. Jan. 18, 2019). At the same time, "[a] plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial

complaint that are like or reasonably related to the substance of charges timely brought before the EEOC." *Lindeman v. Saint Luke's Hosp. of Kansas City*, 899 F.3d 603, 608 (8th Cir. 2018) (citation and quotation marks omitted).

The critical question here is whether the termination claims asserted in Counts I, III, VIII, and X are "like or reasonably related to" Mr. Farmer's August 18th Charge. *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 944 (8th Cir. 2021). As the Eighth Circuit explained in *Weatherly*, "[t]he key is that the scope of a judicial complaint can be no broader than the scope of the EEOC investigation that could reasonably be expected to grow out of the charge in the EEOC complaint." *Id.* at 945 (internal quotation marks omitted). While it is true that Mr. Farmer did not formally amend his Charge, the Court is not persuaded that Mr. Farmer's claims related to his termination were unexhausted. The Charge itself largely overlaps with the claims that were brought in his Complaint, aside from the additional adverse action of termination. Additionally, the EEOC was fully aware of Mr. Farmer's termination and its relationship to his ongoing problems at FilmTec. More importantly, the investigation was ongoing at the time of his termination, and continued for many months afterwards. Neither the EEOC nor FilmTec were unaware of the firing or its relation to Mr. Farmer's claims of ongoing discrimination, and neither could claim surprised at its inclusion in this case. Therefore, the Court finds that Mr. Farmer's claims were adequately exhausted.

## III.   ADA and MHRA Disability Discrimination Claims (Counts I and II)

### A.  Mr. Farmer's Allegations

In Counts I and II, Mr. Farmer alleges disability discrimination and identifies numerous adverse actions that he says he suffered due to that discrimination. As explored below, Mr.

Farmer fails to raise any genuine dispute of material fact sufficient to resist summary judgment on these claims, and they are dismissed.[3]

### B.  ADA and MHRA Disability Claims: The Framework

The ADA proscribes discrimination by an employer "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similarly, the MHRA creates a civil cause of action against employers who discharge an employee based on that individual's disability. Minn. Stat. § 363A.08, subd. 2.

The courts permit "direct" or "indirect" evidence that the complained-of adverse employment action was caused by disability discrimination, which "refer[s] to the causal strength of the evidence, not necessarily whether evidence is circumstantial." *Huber v. Westar Foods, Inc.*, 106 F.4th 725, 735 (8th Cir. 2024), *reh'g granted and opinion vacated,* No. 23-1087, 2024 WL 3892871 (8th Cir. Aug. 21, 2024) (abrogated on other grounds) (citing *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018); *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012)). "Direct evidence is that which shows 'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding

---

[3] One challenge with Mr. Farmer's briefing is that he does not commit to a theory of which adverse actions are attributable to which prohibited motivation or retaliatory impulse. Instead, every adverse employment action identified is attributed, variously, to racial discrimination, to retaliation for exercise of rights, to disability discrimination, or to FMLA interference. There is no clear analysis tying particular actions to prohibited animus. This diffuse kitchen-sink approach to Mr. Farmer's arguments significantly undermines the inferences he asks the Court to draw as to racist, retaliatory, or disability-biased decision-making.

by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *St. Martin*, 680 F.3d at 1033 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). "Direct evidence includes 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Huber*, 106 F.4th at 735 (quoting *Lipp*, 911 F.3d at 543; *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006)). Such evidence—often in the form of "blatant statements expressing discriminatory animus"— will be enough to allow the fact-finder to infer that the defendant had discriminatory intent. *Id.*

Conversely, indirect evidence pointing to a weaker causal link can still be used to prove discrimination based on disability. *See, e.g.*, *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014) ("A temporal connection can demonstrate a causal link between an adverse employment action and the employee's disability."); *Anderson v. KAR Glob.*, 78 F.4th 1031, 1037–38 (8th Cir. 2023) (finding a causal connection between employee's request for accommodation and termination ten days later); *but see Winfrey v. Ford Motor Co.*, No. 4:19-CV-00889-DGK, 2020 WL 1558117, at *3 (W.D. Mo. Apr. 1, 2020) (fact that employee was on medical leave for disability at the time of adverse action did not plausibly show causation).

In situations when a plaintiff presents indirect evidence, the courts apply the burden-shifting structure established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) to both ADA and MHRA disability discrimination claims. *Burchett v. Target Corp.*, 340 F.3d 510, 516 (8th Cir. 2003); *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 n. 4 (8th Cir. 2007). Under this analytical framework, the employee bears the initial burden of proving a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. The employer then has the

burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 802–03. Finally, to prevail, plaintiff must show that the defendant's proffered reason was a pretext for discrimination. *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010).

## C. Prima Facie Case

Mr. Farmer does not present any direct evidence of disability discrimination "show[ing] a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 832 (8th Cir. 2020) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045–46 (8th Cir. 2011) (en banc)). Therefore, the Court employs the *McDonnell-Douglas* burden-shifting framework.

To prove a prima facie case of disability-based employment discrimination, a plaintiff must prove (1) that he has a disability within the meaning of the ADA or MHRA; (2) that he is qualified to perform the essential functions of his job, with or without reasonable accommodation; and (3) that he suffered an adverse employment action because of his disability. *Mell v. Minn. State Agric. Soc'y*, 557 F. Supp. 3d 902, 918–19 (D. Minn. 2021) (quoting *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019)). While FilmTec concedes that Mr. Farmer was qualified for his job, they argue that Mr. Farmer has failed to make a showing as to both whether he has a disability within the meaning of the ADA or MHRA, and that his disability "actually motivated" any of the adverse actions against him. The Court agrees in part.

## 1. Disability Under the ADA and MHRA

Mr. Farmer asserts that his diabetes and back injury both constitute disabilities. Neither

condition qualify as a disability sufficient to trigger ADA or MHRA protection. The Court finds that Mr. Farmer offers evidence from which a jury could find that his diabetes constitutes a disability, but not his back injury.

The MHRA defines a "disability" as a "condition or characteristic that renders a person a disabled person." Minn. Stat. § 363A.03, subd. 12. A "disabled person" is one who "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Mell*, 557 F. Supp. 3d at 919. "The term 'impairment' includes ongoing conditions," and "[t]he degree to which a condition limits one or more major life activities is evaluated based on the plaintiff's specific circumstances." *Id.* (quoting *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 543 (Minn. 2001)). The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the [individual's] major life activities." 42 U.S.C. § 12102(1)(A). "Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning, and working." *Dovenmuehler*, 509 F.3d at 439.

"There is no dispute that diabetes can be an impairment, and that working is a major life activity." *Sigurdson v. Carl Bolander & Sons, Co.,* 532 N.W.2d 225, 228 (Minn. 1995) (cleaned up). Mr. Farmer presented evidence that his diabetes affects his vision, diet, restroom needs, and other abilities, which, in turn, affect his general health and, ultimately, his ability to work. Farmer Dep. 65. To control his diabetes, Mr. Farmer is required to take frequent bathroom breaks and maintain a more disciplined diet. *Id.* And when his diabetic condition became severe at work, he visited FilmTec's onsite nurse. *Id.* at 68. This evidence serves as a

record of the impairment Mr. Farmer experienced as a result of his diabetes.

Mr. Farmer also points to evidence that, at a minimum, creates a dispute of fact regarding whether either FilmTec "regarded" him as having diabetes, or had a record of his diabetes. Mr. Famer included his diabetes in his first Hotline complaint, visited the nurse for his condition, and had to leave work at least once as a result of his diabetes. Indeed, it was discipline for this departure from work that was ultimately reversed upon further investigation, further confirming that, at the latest, by the summer of 2020, FilmTec was aware of his diabetes. This is enough to create a dispute of fact as to whether Mr. Farmer's diabetes counts as a disability under the first prong of the prima facie case. *See, e.g.*, *Cannice v. Norwest Bank Iowa N.A.,* 189 F.3d 723, 727 (8th Cir. 1999) (finding "ample evidence" that employee alerted employer to the existence of disability where employee told employer about disability, gave employer information about the ADA, requested an unmonitored telephone line to talk with his "support network," and displayed symptoms of the disability at work); *Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995) (recognizing that employer has notice of limitation when disability manifests itself to the extent that "it would be reasonable to infer that [her] employer actually knew of the disability") (quoting *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995)).

The Court reaches the opposite conclusion about whether Mr. Farmer's back pain counts as a disability for two reasons. First, this argument has been waived. Mr. Farmer never hinted at his back pain as a disability in his EEOC charge, in his Complaint, or even in his discovery responses. It was not until his brief in opposition to summary judgment that he made such a claim, and he did so only in passing. Second, the record does not support his ninth-

inning attempt to change the contours of this case. The short duration of Mr. Farmer's back impairment weighs against a disability finding. *See, e.g., City of Cambridge v. One Love Hous., LLC*, No. A20-1313, 2021 WL 2645519, at *7 (Minn. Ct. App. June 28, 2021) ("[T]emporary impairments with little or no long-term impact were not disabilities."); *Ciszewski v. Engineered Polymers Corp.*, 179 F. Supp. 2d 1072, 1086 (D. Minn. 2001) (plaintiff's tendonitis, which developed and began shortly after her hire, and continued since then, qualified as a "lengthy duration . . . weigh[ing] in favor of a disability finding"). In this case, Mr. Farmer's back injury occurred while he was pouring concrete at his home in 2020, and it was apparently resolved enough for him to return to work after a few months. Aside from simply stating in his brief that it is a disability, Mr. Farmer has made no factual showing whatsoever that his back injury satisfies either the ADA or MHRA definitions of disability. Therefore, the Court finds Mr. Farmer raises a prima facie showing that his diabetes was a qualifying disability, but not his back injury.

## 2. Adverse Employment Consequence

Mr. Farmer must next show that FilmTec took adverse employment actions against him "because of" his diabetes. The first question is whether he experienced any adverse employment actions, and then the Court will turn to whether Mr. Farmer has tied them to his disability.

Mr. Farmer points to several adverse actions that he claims are attributable to his disability: being passed over for two promotions for positions he was qualified to obtain; receiving documented coaching for leaving his workstation without first advising his supervisor; being put through an unusual process for taking medical leave; and ultimately

being terminated. The Court agrees that all but one of these arguably constitute an adverse action, and notes that FilmTec does not offer meaningful argument to the contrary.

Specifically, the Court finds that the reversed "documented coaching" isn't an adverse action under either the ADA or the MHRA. Mr. Farmer received discipline in April of 2020 in the form of a "documented coaching" for leaving his workstation without permission, apparently due to his diabetes. First, the coaching, essentially a note in his file, is simply not enough to constitute an adverse action under governing law. *See, e.g.*, *Muldrow v. City of St. Louis,* 601 U.S. 346, 354 (2024) (noting that an adverse employment action must be a "'disadvantageous' change in an employment term or condition"). Here, Mr. Farmer makes no showing or even argument that the documented coaching in his file satisfies that requirement. More critically, that coaching was reversed and removed from Mr. Farmer's file entirely following the investigation. There is no hint in the record that it acted as anything "disadvantageous" after that correction. It is not an adverse employment action.

### D. FilmTec's Proffered Non-Discriminatory Reasons

Because Mr. Farmer has made a preliminary showing that he suffered some adverse consequences at work, at least through the favorable lens applicable at this stage, the burden shifts to FilmTec to offer non-discriminatory reasons for each of the remaining adverse actions at issue. The evidence in support of FilmTec's positions is described at length in the fact discussion above. Regarding the two promotions, FilmTec points to evidence in the record that demonstrates that other candidates were hired for reasons that had nothing to do with Mr. Farmer's diabetes. In one case, FilmTec had doubts about Mr. Farmer's commitment to the job, and in another they selected a former employee as a candidate and canceled all interviews,

including Mr. Farmer's. In neither case does Mr. Farmer offer any evidence about whether these new hires were disabled or not. With respect to the purported delays in returning Mr. Farmer to work following his leave, FilmTec references the detailed evidence in the record about the process for returning an employee to work following medical leave, and highlights uncontroverted evidence that, in several ways, Mr. Farmer's own actions hampered the process and delayed his return to work; other delays were due to things like his doctor being slow to submit records. Finally, FilmTec presents evidence indicating that it terminated Mr. Farmer's employment due to the threatening and insubordinate conduct Mr. Farmer displayed during his return-to-work meeting, which violated FilmTec's Core Values. Each of these satisfy FilmTec's obligation to come forward with evidence supporting non-discriminatory reasons for the adverse action taken, and each are well-substantiated in the record.

### E.  Pretext and Evidence of a Causal Link to Discrimination

Since FilmTec has provided legitimate, non-discriminatory reasons for each adverse action, Mr. Farmer must meet his "ultimate burden" of producing evidence revealing that FilmTec's "justifications are mere pretext." *Torgerson*, 643 F.3d at 1046. "[P]roving pretext . . . 'requires more substantial evidence than it takes to make a prima facie case' and 'evidence of pretext and discrimination is viewed in light of [FilmTec's] justification.'" *King v. Guardian ad Litem Bd.*, 39 F.4th 979, 987 (8th Cir. 2022) (quoting *Phillips v. Mathews*, 547 F.3d 905, 912–13 (8th Cir. 2008)). When considering whether an employer's reason for firing is pretext, "the ultimate question is whether the plaintiff presents evidence of 'conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor

in [the employer's] decision to fire [the plaintiff].'" *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc) (quoting *Feltmann v. Sieben*, 108 F.3d 970, 975 (8th Cir. 1997)) (alterations in *Kiel*). A plaintiff can show a question of fact exists regarding pretext by exhibiting that (A) "the employer's explanation is unworthy of credence . . . because it has no basis in fact" or (B) "a prohibited reason more likely motivated the employer." *Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 748 (8th Cir. 2021) (alteration in original) (citations omitted). Overall, a plaintiff must identify facts plausibly showing that his disability "actually played a role" in a decision to discipline him, terminate him, or otherwise treat him unfavorably. *Lewis v. CNA Nat'l Warranty Corp.*, 63 F. Supp. 3d 959, 961–62 (D. Minn. 2014) (quoting *Goins v. West Grp.*, 635 N.W.2d 717, 722 (Minn. 2001)). In other words, there must be some sort of "'specific link' between the discrimination and the adverse action[.]" *Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 990–91 (8th Cir. 2007) (addressing an ADA claim); *see also Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019) (applying the same causation standard to claims under the ADA and MHRA).

The Court finds that even with all inferences read in favor of Mr. Farmer there is no genuine dispute of material fact that would support a causal link between Mr. Farmer's diabetes and the adverse employment actions he identifies.

First, as to his termination, the record is uncontroverted that FilmTec fired Mr. Farmer because he violated the Code of Conduct during the February 1, 2021 meeting and acted in a disrespectful and threatening manner. Mr. Farmer argues that FilmTec's reason for terminating him is in fact pretextual, as FilmTec "surprised Mr. Farmer with multiple disciplines from several months prior." ECF No. 49, Pl.'s Opp'n 21. Mr. Farmer asserts that FilmTec's

justifications for holding the meeting were "unusual," as was Human Resources' involvement with his medical leave, and that Ms. Kaluza "perpetuated similar behavior toward another African-American/Black individual who used medical leave."[4] *Id.* at 21–22. By doing so, Mr. Farmer attempts to portray a factual dispute regarding pretext by showing "that the employer's explanation is unworthy of credence . . . because it has no basis in fact" or "by persuading the court that a [prohibited] reason more likely motivated the employer." *Schaffhauser v. United Parcel Serv.*, 794 F.3d 899, 904 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1047) (alterations in *Schaffhauser*). But he does not succeed.

The Eighth Circuit has held an employee's violation of a policy or rule constitutes a legitimate, nondiscriminatory reason for that employee to be disciplined or terminated. *See, e.g.*, *EEOC v. Trans States Airlines, Inc.,* 462 F.3d 987, 992 (8th Cir. 2006) (violation of company policy is a legitimate, non-discriminatory reason for termination). Here, under any version of the facts, Mr. Farmer was fired for his conduct during the meeting. Even Mr. Farmer's disagreement about precisely what was said is insufficient to overcome summary judgment. That is because he "must present sufficient evidence that [FilmTec] acted with an intent to discriminate, not merely that the reason stated by [FilmTec] was incorrect." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) ("If an employer, in explaining a termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation

---

[4] The Court notes that FilmTec had a likely unusual amount of difficulty substantiating Mr. Farmer's injury and following its process for returning him to work, given the delays, lack of records, missed appointments, and incomplete simulations. The involvement of Human Resources can hardly be remarkable given such a situation.

28

was false."). Mr. Farmer points to no facts in the record to support that he was actually fired for being diabetic rather than for his conduct during the meeting.

Mr. Farmer's attempt to tie the other adverse actions to his diabetes suffer from the same infirmity. There is no hint in the record that his non-promotion or FilmTec's handling of his return to work had anything to do with his diabetes. He points to no evidence in the record to show that the reasons proffered by FilmTec for each of these actions is pretext for disability discrimination. He also offers no circumstantial evidence to support an inference, such as evidence of similarly situated comparators, disability-biased comments, or shifting and incredible explanations provided by FilmTec. Simply asserting in briefing that there is likely a discriminatory reason for a certain action is not enough to resist summary judgment.  Mr. Farmer "must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Vinh v. Express Scripts Servs. Co.*, 7 F.4th 720, 727 (8th Cir. 2021) (quoting *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998)). He has not done so.

Therefore, the Court grants summary judgment to FilmTec on Mr. Farmer's disability discrimination claims under the MHRA and the ADA.

## IV.   Retaliation Under the ADA and MHRA (Counts III and IV)

Mr. Farmer next alleges he was retaliated against[5] with his rights related to his

---

[5] Although Mr. Farmer mentions interference with both ADA and MHRA disability rights in Counts III and IV of the Complaint, he only offers argument in his briefing about retaliation related to disability. The Court finds that any claims related to interference with his ADA or MHRA disability rights as to his diabetes are waived. To the extent that he is arguing that his right to take and return from medical leave was interfered with, the Court has already held that his leave was not due to his disability of diabetes but to a short-term injury, and he has not established that

disability. The Court agrees with FilmTec that there is no genuine dispute of material fact and that these claims fail as a matter of law.

### A. Standard

The ADA and the MHRA both have provisions that address retaliation in the workplace. The ADA makes it illegal to interfere with an individual's "exercise or enjoyment" of ADA-protected rights or to take negative action because an individual does so:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b); *Riggs v. Bennett Cnty. Hosp. & Nursing Home*, No. 16-cv-5077-JLV, 2019 WL 1441205, at *20 (D.S.D. Mar. 31, 2019) (citing 42 U.S.C. § 12203(b)). And under the MHRA, "[i]t is an unfair discriminatory practice . . . to deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of" protected characteristics, including disability. *Johnson v. Schulte Hosp. Grp., Inc.*, 66 F.4th 1110, 1114 (8th Cir. 2023) (quoting Minn. Stat. § 363A.11, subd. 1(a)(1) (2022)).

As noted above, "[c]laims under the ADA and MHRA are analyzed under the *McDonnell Douglas* burden-shifting analysis." *Henne v. Great River Reg'l Libr.*, No. 19-cv-2758 (WMW/LIB), 2021 WL 6804560, at *7 (D. Minn. Jan. 4, 2021) (quoting *Brunckhorst*, 283 F. Supp. 3d at 753 (D. Minn. Sept. 28, 2017)), *aff'd*, 914 F.3d 1177 (8th Cir. 2019). To

---

it constitutes a protected disability.

establish a prima facie case for a retaliation claim, a plaintiff, such as Mr. Farmer, must establish the following elements: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two. *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007) (discussing retaliation under the ADA); *see also Bahr v. Capella Univ.*, 788 N.W.2d 76, 81 (Minn. 2010) (analyzing reprisal under the MHRA) (citing *Hoover*, 632 N.W.2d at 548).

**B. Analysis**

Mr. Farmer alleges that he engaged in protected activities by making numerous anonymous complaints to the Ethics Hotline, filing an EEOC charge, and taking medical leave as a result of his back injury. In retaliation for those disability-related actions, Mr. Farmer claims he was denied promotions, received improper discipline related to his diabetes, and then shortly after filing his charge, he was put through an unusual process for taking medical leave, and ultimately terminated. FilmTec disagrees that any of these actions had anything to do with his disability and argues that there is no material dispute of fact that would stand in the way of summary judgment.

Mr. Farmer identifies two places where he invoked rights related to his disability: his April Hotline complaint and his EEOC charge.[6] The Court agrees that in both, he mentioned his disability and referenced disability discrimination, and they satisfy the first step of his prima facie case. However, Mr. Farmer's claim of disability-rights retaliation fails because he cannot make a prima facie showing that any identified adverse action had any relationship to

---

[6] As discussed, Mr. Farmer failed to establish that his medical leave was related to a disability.

his protected activities.

First, the promotions Mr. Farmer did not receive pre-dated both the hotline complaint and the EEOC charge. It cannot be that FilmTec failed to promote him in retaliation for protected activity that had not yet occurred. Second, there is no evidence in the record that the issues with his return-to-work or his ultimate termination were retaliation for either of those protected activities. Instead, as explored above, FilmTec points to uncontroverted evidence in the record regarding non-retaliatory reasons for both of those actions, and nothing in the record hints at a connection between either and his protected activity.

Mr. Farmer's only evidence to support causality between his protected activity and his termination is an inference from temporal proximity. He filed both complaints the summer before he took leave, and was terminated early the following year. But the timing alone is not enough. *Cf. Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) ("The mere coincidence of timing, however, is rarely sufficient to establish the causation element."). And because there were intervening acts between the protected activity and each adverse consequence–the difficulty in getting Mr. Farmer back to work and his conduct at the return-to-work meeting–any inference of causation from timing is flatly belied by the record. *See Kiel*, 169 F.3d at 1136 (finding that plaintiff's angry outbursts constituted "intervening unprotected conduct [that] eroded any causal connection . . . suggested by the temporal proximity of his protected conduct and [the adverse action]"); *Mervine v. Plant Eng'g Servs., LLC*, 859 F.3d 519, 527 (8th Cir. 2017) ("Whatever causal inference that might have been drawn from the temporal proximity between [plaintiff's] protected activity and the termination of his employment was vitiated by the intervening . . . misconduct."); *Lockridge v. Per Mar*

32

*Sec. & Research Corp.*, No. 12-cv-2894 (MJD/JJK), 2014 WL 4626355, at *11 (D. Minn. Sept. 15, 2014) (findgin that plaintiff's threatening and intimidating conduct and failure to perform work constituted intervening events that "erode[d] causal connection based on temporal proximity."), *aff'd*, 603 Fed. Appx. 522 (8th Cir. 2015).

Since Mr. Farmer cannot show that FilmTec terminated him because of his engagement in statutorily protected activities, he fails to satisfy the third element of a prima facie case of ADA or MHRA unfair reprisal—which requires the adverse action to be "causally linked to the protected conduct." *Kiel*, 169 F.3d at 1136. And while Mr. Farmer "is entitled to the benefit of all reasonable inferences that may be drawn from the evidence[, he] is not entitled . . . to the benefit of unreasonable inferences . . . that amount to more than mere conjecture." *ACT, Inc., v. Sylvan Learning Sys., Inc.*, 296 F.3d 657, 666 (8th Cir. 2002). Again, simply asserting that he was terminated because he engaged in protected activity is not enough.

Accordingly, FilmTec is entitled to summary judgment as to Counts III and IV.

## V.  FMLA Interference and Retaliation (Count V)

Candidly, Mr. Farmer's FMLA retaliation and interference claims blur and overlap with his other retaliation claims in ways that make it somewhat difficult to analyze. But it appears that Mr. Farmer alleges that FilmTec interfered with his rights under the FMLA, specifically related to his extended leave for his back injury.

### A.  FMLA

The FMLA entitles an employee to "12 workweeks of leave during any 12-month period" for a serious health condition. 29 U.S.C. § 2612(a)(1)(D). If an employee feels that their leave has been mishandled, the employee can bring two types of claims against its

employer, "(1) 'interference' claims where the employee alleges that the employer denied or interfered with substantive rights under the FMLA; and (2) 'retaliation' claims where the employee alleges that the employer discriminated against them for exercising their FMLA rights." *Brandt v. City of Cedar Falls*, 37 F.4th 470, 478 (8th Cir. 2022) (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011)). "The difference between [interference and retaliation] claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006). "Basing an adverse employment action on an employee's use of leave, or in other words, retaliation for exercise of Leave Act rights, is therefore actionable." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002).

## A. Analysis

### *Interference*

For an employee to succeed with an FMLA interference claim, they must demonstrate that they were "denied substantive rights under the FMLA for a reason connected with [their] FMLA leave." *Black v. Swift Pork Co.*, No. 23-1502, 2024 WL 3960228, at *3 (8th Cir. Aug. 28, 2024) (quoting *Stallings*, 447 F.3d at 1050, parenthetically). "Discouraging an employee from using such leave," or "manipulation by a covered employer to avoid responsibilities under FMLA" are examples of interference. *Johnson v. City of Blaine*, 970 F. Supp. 2d 893, 913 (D. Minn. 2013) (quoting *Stallings,* 447 F.3d at 1050). "To succeed on a claim of FMLA interference, an employee must show she was eligible for FMLA leave, the employer knew she needed FMLA leave, and the employer denied her an FMLA benefit to which she was

entitled." *Smith v. AS Am., Inc.*, 829 F.3d 616, 621 (8th Cir. 2016).

FilmTec asserts that there is no evidence that FilmTec denied Mr. Farmer any FMLA benefits. Indeed, there is no dispute that Mr. Farmer received fully paid FMLA leave for many weeks. To the extent Mr. Farmer is arguing that FilmTec interfered with his ability to return to work, the record demonstrates to the contrary, and no material fact is in dispute to preclude summary judgment in FilmTec's favor. The record demonstrates that FilmTec repeatedly sought to have Mr. Farmer approved for return to work, but those efforts were stymied, variously, by his physician not retuning records, by Mr. Farmer not completing a needed evaluation, and by Farmer losing his phone and not advising his employer of his new contact information.[7]

### *Retaliation*

The Court next turns to Mr. Farmer's FMLA retaliation claim. As noted above, unlike an interference claim, a "retaliation claim requires proof of retaliatory intent." *Stallings*, 447 F.3d at 1051. As a result, it is unlawful to base a negative employment decision on a worker's use of leave—or, to put it another way, retaliating against an employee for using their rights under the Leave Act. *Allen Health Sys., Inc.*, 302 F.3d at 832. Where a plaintiff asserts an FMLA retaliation claim, absent direct evidence, we use the same *McDonnell Douglas* burden-shifting framework as ADA discrimination claims. *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 866 (8th Cir.

---

[7] The statements Mr. Renz made in his deposition regarding his belief that Ms. Kaluza's involvement in Mr. Farmer's leave process was unusual are not enough to establish a dispute of material fact. Indeed, that belief does not undermine the thoroughly documented chronology in the record involving Mr. Farmer's leave and FilmTec's efforts to return him to work. Moreover, Mr. Renz's own testimony acknowledged the limited and dated basis for his opinion, which is based on his own experience with leave.

2015). A plaintiff must show: (1) they "engaged in protected conduct"; (2) they "suffered a materially adverse employment action"; and (3) "the materially adverse action was causally linked to the protected conduct." *Wierman*, 638 F.3d at 999. A "materially adverse action" is one that "deter[s] a reasonable employee from making a charge of employment discrimination." *Id.* (quoting *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077–78 (8th Cir. 2010)). Termination from employment is a materially adverse action. *Id.*

There is no dispute in this case as to the first two prongs. Mr. Farmer engaged in protected activity under the FMLA by taking leave and suffered an adverse employment action when he received discipline during the return-to-work meeting and was then terminated. But there is simply no evidence in the record that either his discipline or termination were attributable to his leave. Instead, the uncontested evidence in the record shows that the discipline he was presented with upon his return to work was initiated prior to his leave, and his termination was due to his hostile reaction to that discipline. Simply arguing in briefing that the actions must have been due to him taking leave is not enough to create a dispute of material fact.

Once again, the only fact that hints at a retaliatory motive here is the timing of Mr. Farmer's leave in relation to his termination from FilmTec. An adverse action taken in close proximity to an FMLA leave could support an inference of a causal link. *See Allen Health Sys., Inc.*, 302 F.3d at 833 (finding two weeks between protected FMLA activity and adverse employment action were "extremely close in time" and therefore raised an issue of fact on retaliation). But here, given the evidence in the record undermining any such inference that could be raised from the chronology, the timing without more is not enough to create an actual dispute. S*ee Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) ("Evidence

of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."). Indeed, had Mr. Farmer not engaged in misconduct during the return-to-work meeting, the uncontroverted evidence shows that he would have been allowed to continue working on a probationary status. Summary judgment in favor of the defendants is appropriate as to Count V.

## VI.   Hostile Work Environment under Title VII and MHRA (Counts VIII and IX)

Mr. Farmer also raises claims of mistreatment and retaliation based on race. The Court first considers his claim that FilmTec was a hostile work environment.

### A. Standard

Once again, the analytical framework for considering Mr. Farmer's hostile work environment claim is the same for both Title VII and the MHRA. Employers are prohibited from discriminating against workers on the basis of race under the MHRA. *See Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964–66 (8th Cir. 2023). And when persistent harassment or a hostile work environment are "sufficiently severe or pervasive to alter the conditions of [the employee's] employment and create[] an abusive working environment," Title VII allows for legal action. *Jackson v. Minn. Dep't of Hum. Servs.*, No. 20-cv-749 (KMM/TNL), 2022 WL 5115436, at *7 (D. Minn. Oct. 4, 2022) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)), *reconsideration denied*, No. 20-cv-749 (KMM/TNL), 2022 WL 16578437 (D. Minn. Nov. 1, 2022).

"To establish a prima facie case of hostile work environment, [Mr. Farmer] must prove: (1) that [he] was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and [his] membership in the protected group;

(4) that the harassment affected a term, condition, or privilege of his employment; and (5) that [FilmTec] knew or should have known of the harassment and failed to take prompt and effective remedial action." *Vajdl v. Mesabi Acad. Of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007). Courts must take into account "the frequency of the offending conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with work performance" when determining whether there is a hostile work environment that can be taken legal action in. *Yang*, 79 F.4th at 964 (quoting *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 630 (8th Cir. 2005)).

The hostile workplace calculations under Minnesota law are similar. Generally speaking, "verbal and physical harassment directed at an employee . . . may constitute discrimination in the terms and conditions of employment" under the Human Rights Act. *LaMont v. Indep. Sch. Dist. # 728*, 814 N.W.2d 14, 21 (Minn. 2012). Plaintiffs alleging a hostile work environment must show: (1) they are a member of a group that has protected status under the Human Rights Act; (2) they were subject to unwelcome harassment; (3) the harassment was based on their membership in a protected group; and (4) the harassment affected a term, condition, or privilege of their employment. *Frieler v. Carlson Mktg. Gr., Inc.*, 751 N.W.2d 558, 571 n.11 (Minn. 2008). The discriminatory conduct creating the hostile work environment must be so severe or pervasive so as "to alter the conditions of the plaintiff's employment and create an abusive working environment." *Kenneh v. Homeward Bound, Inc.*, 944 N.W.2d 222, 230 (Minn. 2020) (cleaned up). The "harassment must be more than minor: 'the work environment must be both objectively and subjectively offensive in that a reasonable person would find the environment hostile or abusive and the victim in fact perceived it to be

so.'" *Id.* at 230–31 (quoting *LaMont*, 814 N.W.2d at 22).

**B. Analysis**

For several reasons, Mr. Farmer's hostile work environment claim fails. Mr. Farmer appears to argue that the general environment at FilmTec, in addition to the comments and actions taken by Herr and Pace, amounted to harassment that was sufficiently severe and pervasive so as to create a hostile work environment. Though the question of whether alleged harassment is sufficiently severe or pervasive is generally a question of fact for the jury, *see Kenneh*, 944 N.W.2d at 232, a reasonable person could not conclude that the evidence here, when viewed objectively, demonstrates that Mr. Farmer suffered any misconduct so severe or pervasive that it "alter[ed] the conditions of employment and create[d] an abusive working environment," *id.* at 230.

First, very little of the alleged conduct was in fact related to race, and two of the three racially charged incidents were not directed at him. Mr. Farmer identifies two employees who used a racial slur (only one of the employees made the slur in his presence) and one incident of anti-Asian vandalism on an information board. Otherwise, the vast majority of incidences Mr. Farmer identifies in his brief have no clear or even arguable tie to race. Pl.'s Opp'n 29 n.15 ("This included: his termination, April discipline, two October disciplines, lack of promotion, assignment to physically demanding work, and disparate treatment when compared to injured, white counterparts."). *See, e.g.*, *Tisdell v. McDonough*, No. 21-3658, 2023 WL 2486083, at *2 (8th Cir. Mar. 14, 2023) (per curiam) ("The alleged use of [an offensive] phrase outside of [his] presence, while troubling, is insufficient to support a claim for hostile work environment."); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004) ("A

hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated incidents."); *Spencer v. Dep't of Corr.*, No. A07-0462, 2008 WL 668259, at *8 (Minn. Ct. App. Mar. 11, 2008) ("Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to a hostile-work-environment claim under the MHRA.").

Second, the alleged racially charged incidents were simply not severe or pervasive enough to survive summary judgment. The Eighth Circuit has set a high bar for showing a claim of hostile work environment. *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (calling the standard a "stringent" one and explaining that courts look to "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance") (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21–23 (1993)); *Ways v. City of Lincoln*, 871 F.2d 750, 754–56 (8th Cir. 1989) (holding that employee continually subjected to racial slurs, comments, jokes, and cartoons throughout 17-year career was sufficient to sustain a hostile work environment claim). Here, Mr. Farmer's own brief does very little to describe or contextualize the racial comments at issue.[8] But it appears that two co-workers used racist language, perhaps more than once, to describe Mr. Farmer's boss and were terminated as a result. In addition, a COVID-19 poster in the breakroom was vandalized. These very isolated incidents are simply not enough to establish the severe and widespread racial hostility required for a hostile workplace environment claim. *See, e.g.*, *Griffith*, 387 F.3d

---

[8] In addition, Mr. Farmer does not cite the record related to any racial slurs.

at 739 (holding three isolated incidents of racial slurs not directed at plaintiff do not create a hostile environment); *Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir. 2003) ("Offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment."); *Woodland*, 302 F.3d at 843–44 (holding that co-workers' racial epithets, obscene gestures, circulation of fascist messages, and racist graffiti were insufficient).

Finally, the record makes clear that FilmTec took significant corrective action when alerted about the racist conduct. They conducted two investigations—ultimately leading to the termination of the employees who used racist language—and they confirmed that the vandalized poster had been up only briefly. This uncontested record undermines any suggestion that FilmTec failed to act. The Eighth Circuit has ruled that an employer is not liable if it takes prompt remedial action that is reasonably calculated to stop the harassment. *See, e.g.*, *Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 532 (8th Cir. 2008) (finding that even if coworker's conduct "rose to the level of . . . harassment, [the employer] took prompt and effective remedial action," precluding the employee's claim of hostile work environment); *see also Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 699 (8th Cir. 2021) (depending on the particulars of a situation, "'employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination' are acceptable remedial options for employers to take"). For these reasons, Mr. Farmer fails to point to a genuine dispute of material fact that would sustain a claim of hostile work environment.

Accordingly, FilmTec is entitled to summary judgment on Mr. Farmer's hostile environment claims under Title VII and the MHRA.

## VII.   Retaliation under Title VII and the MHRA (Counts X and XI)

In addition to raising retaliation claims based on disability, analyzed above, Mr. Farmer alleges retaliation under federal and state law based on race. Mr. Farmer asserts that he was retaliated against for complaining of FilmTec's discriminatory actions in violation of Title VII and the MHRA. Specifically, he identifies most of the same protected conduct (the Hotline complaints and the EEOC Charge) and most of the same adverse consequences as he does in his disability-rights retaliation claim, but in Counts X and XI he emphasizes the racial characteristics of the protected conduct and blames that characteristic for the retaliatory acts. These claims fail for similar reasons. There is no evidence from which a factfinder could find that the identified adverse employment actions are retaliatory for Mr. Farmer's protected activity related to racial discrimination.

### A. Standard

As with the above claims, the analysis set forth in *McDonnell-Douglas* is applicable to Mr. Farmer's claims of retaliation. In order to establish a prima facie case of retaliation under Title VII and the MHRA, Mr. Farmer must show that: (1) he engaged in statutorily-protected conduct; (2) he suffered an adverse action; and (3) a causal connection exists between Mr. Farmer's protected conduct and the adverse action. *Kipp v. Mo. Hwy. & Transp. Comm'n.*, 280 F.3d 893, 896 (8th Cir. 2002); *Larson v. Arthur J. Gallagher & Co.*, No. CIV. 13-cv-1506 (JNE/SER), 2013 WL 4734021, at *5 (D. Minn. Sept. 3, 2013) (citing *Quinn v. St. Louis Cty,* 653 F.3d 745, 751 (8th Cir. 2011)).

**B. Analysis**

The Court finds once again that Mr. Farmer's Hotline complaints and EEOC Charge–both of which specifically invoked issues of mistreatment due to race–qualify as protected activity. Mr. Farmer contends that he experienced a variety of adverse consequences as a result, including increased scrutiny, interference with his FMLA leave and difficulty with his return to work, multiple disciplines without proper investigation, denial of promotions, and ultimately, the termination of his employment, and several of those qualify as adverse employment actions under the law.

However, for three reasons, the Court finds that Mr. Farmer's claims fail at the third prong because there is no material dispute of fact that could indicate a causal relationship between the protected activity and the adverse consequences. First, it is unclear which adverse actions are allegedly tied to which protected activities. For instance, the two promotions at issue predate any protected activity, as does any discipline prior to April 2020. There can be no retaliation for protected activity which had not yet occurred. Second, once again, there is no evidence tying those incidents of discipline (the discipline for the conduct in October and the termination) to retaliation for the protected conduct. As explained above, the uncontested evidence in the record demonstrates that Mr. Farmer was disciplined in February for violating policy in October, and he was terminated for his conduct in the return-to-work meeting.[9] Simply highlighting that Mr. Farmer engaged in protected activity prior to these two adverse

---

[9] It is noteworthy that in both instances, Maurice Roberts was a primary actor in the discipline. The record demonstrates that no one ever heard Mr. Roberts, who is also Black, use racially charged language or act in a racist manner. Instead, Ms. Kaluza's investigation showed that he had been the target of racist comments himself, rather than someone who acted in a biased way.

CASE 0:22-cv-02974-KMM-DLM   Doc. 56   Filed 09/19/24   Page 44 of 44

consequences and asserting that there is a causal link is not enough to create a material dispute of fact in the face of this uncontested record. Therefore, the Court grants summary judgment to FilmTec as to Mr. Farmer's race retaliation claims under Title VII (Count X) and the MHRA (Count XI).

**ORDER**

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that FilmTec's Motion for Summary Judgment [ECF No. 32] is **GRANTED** and Mr. Farmer's Complaint [ECF No. 1] is hereby **DISMISSED WITH PREJUDICE**.

**Let Judgment be entered accordingly**.


Date: September 19, 2024                    *s/Katherine Menendez*
                                            Katherine Menendez
                                            United States District Judge